## The State v. West, *Appellant.*

1. **Criminal Practice :** REMARKS OF PROSECUTING ATTORNEY : EXCEPTION. Where no exception is saved to remarks of prosecuting attorney complained of, they will not be reviewed by the Supreme Court.

2. ———: DEFENDANT AS A WITNESS: IMPEACHING CREDIBILITY. A defendant, testifying in his own behalf, can have his credibility impeached by proof of former inconsistent statements.

3. ———: ———: CROSS-EXAMINATION. Where the defendant, on trial for murder, testifying in his own behalf, gave a detailed account of his feelings on the day of the homicide, for the purpose of showing absence of malice, it was proper, on cross-examination, to ask him if he did not, on the day of the homicide, state that he had the same right to kill a man trying to steal his land as one trying to steal his horse. The evidence was competent as a foundation for proof of a state of mind different from that testified to by defendant in chief.

1.   ——— : ——— : ——— : OBJECTIONS TO EVIDENCE. Where, upon
cross-examination, for the purpose of impeaching a witness,
extracts from his evidence taken before the coroner's inquest were
read to him, and he was asked if he did not testify to the state-
ments read from his evidence, and the defendant objected without
assigning any reason therefor, he cannot, on appeal, assign as a
reason for his objection that the witness ought not to have been
required to answer until the whole of his evidence had been read.

*Appeal from Barton Circuit Court.* — HON. D. P.
STRATTON, Judge.

AFFIRMED.

*E. J. Montague* for appellant.

(1) The court below erred in giving instruction
numbered two for the state. *White v. Maxey*, 64 Mo.
552. (2) The court erred in permitting the prosecuting
attorney to single out extracts from the written state-
ments of the testimony of Elger and Walter West, before
the grand jury and coroner's inquest, and predicate
questions upon such extracts for the purpose of contra-
diction and impeachment. 1 Greenl. on Evid., sec. 463 ;
*State v. Matthews*, 88 Mo. 121 ; *Prewett v. Martin*, 59
Mo. 325. (3) The court erred in permitting the defend-
ant to be cross-examined upon matters not embraced in
his examination in chief. *State v. Porter*, 75 Mo. 171 ;
*State v. Palmer*, 88 Mo. 568 ; *State v. Bulla*, 89 Mo. 595.
(4) The court erred in permitting the prosecuting attor-
ney in his closing argument to comment on facts not in
evidence. *State v. Kring*, 64 Mo. 591 ; *State v. Lee*, 66
Mo. 165 ; *State v. Johnson*, 76 Mo. 121. (5) The instruc-
tions given for the state contained material error.
(6) The court erred in refusing defendant's third instruc-
tion. The testimony of defendant and his two sons
tended to show justifiable homicide, and defendant was
entitled to an instruction based on that testimony.
*State v. Sloan*, 47 Mo. 604 ; *State v. Banks*, 73 Mo. 592 ;

*State v. Eaton*, 75 Mo. 586, 591 ; *State v. Palmer*, 88 Mo. 568, 572.

*B. G. Boone*, Attorney General, for the state.

(1) The indictment is in the usual form and properly charges murder in the first degree. Whar. on Hom. (2 Ed.) sec. 791 ; *State v. Collins*, 86 Mo. 245. (2) No error was committed in the admission or exclusion of evidence and the defendant will not be heard to complain. *State v. Holmes*, 54 Mo. 153 ; *State v. Emery*, 76 Mo. 348 ; *State v. Owen*, 78 Mo. 367. (3) The prosecuting attorney was authorized in asking witnesses for the defence if they had not testified to certain facts, stating them, before the coroner's jury and the grand jury in regard to the case on trial, and in subsequently reading copies of such testimony to the jury. 1 Greenl. Evid. (14 Ed.) sec. 462. (4) The instructions given by the court correctly declared the law. *State v. Pagels*, 92 Mo. 316 ; *State v. Wisdom*, 84 Mo. 177 ; *State v. McGee*, 85 Mo. 647 ; *State v. Thomas*, 78 Mo. 327 ; *State v. Hicks*, 10 West. Rep. 415. (5) Full and complete instructions having been given by the court, those asked by defendant were properly refused. *State v. Smith*, 80 Mo. 516. (6) No objections were made, or exceptions saved at the time, to the alleged remark of counsel for the state in his argument to the jury. This court cannot consider it. *State v. Pagels*, 92 Mo. 300.

BRACE, J.—The defendant, indicted in the circuit court of Barton county for murder in the first degree, was convicted of murder in the second degree, and his punishment assessed at imprisonment in the penitentiary for a term of twenty-five years. He appeals, and assigns for error that the court gave improper and refused proper instructions, failed to instruct upon the whole case, admitted illegal testimony, permitted an

improper cross-examination of defendant and of defendant's witnesses, and improper remarks to be made by the prosecuting attorney in his closing address to the jury.

After a careful examination of all the instructions given, and due consideration of the objections urged by counsel against those criticized in his brief, we fail to detect reversible error in any of them. They are all such as have repeatedly received the sanction of this court, and proper to be given upon the facts in evidence in this case. The legal principles declared in those refused, so far as they were applicable to the case and proper to be given, were previously covered in those given, and there was no error in the refusal. There was no manslaughter in the case, it was either murder in the first or second degree on the evidence, or justifiable homicide, and no error was committed in failing to instruct on manslaughter.

No exception having been taken or saved to the remarks of the prosecuting attorney complained of, they are not before us for review. *State v. Pagels* 92 Mo. 300. Of the errors assigned there are but two that require any extended consideration.

I. The defendant, who testified as a witness in his own behalf, on his cross-examination was asked the following question: "Did you state to Si Finley on that day (the day of the homicide) coming in here, that you had the same right to kill a man who was trying to steal your land, as you would if he was trying to steal your horse?" In answer to the question, he said: "I do not recollect of saying that; if I did, I did not intend saying it. I was bowed down in sorrow and terror, and I might have been misunderstood; I did not mean to say that any way. I did not go to Reynolds after he was shot; I went in ten or twelve feet of him; I was struck with grief the moment after the shooting." No objection was made or exception taken to the other questions asked and answered by the defendant, and we

have only this one for consideration. The language of
the statutory provision permitting a defendant in a
criminal case to testify in his own behalf is, that he
"shall be liable to cross-examination as to any matter
referred to in his examination in chief, and may be con-
tradicted and impeached as any other witness in the
case." R. S., 1879, sec. 1918. If the defendant testi-
fying in his own behalf may be contradicted and
impeached the same as any other witness in the case, he
is liable to have his credibility impeached by proof of
former inconsistent statements. _State v. Brooks_, 92 Mo.
542 ; 1 Greenl. Evid., sec. 462. The inconsistent state-
ments, however, that can be shown for this purpose on
his cross-examination must be confined to those made
concerning a matter referred to by him in his examina-
tion in chief.

In this case, the defendant, in his examination in
chief, gave a detailed and graphic account of the homi-
cide, including all the events immediately preceding
and leading up to the tragedy, and those that transpired
afterwards up to the time of his arrest, and took occas-
ion, all through his evidence, when to him it seemed
apposite, to speak of his feelings, thoughts, intentions,
fears, opinions, and even of what he called his instinct,
portraying, as vividly perhaps as his words would
permit, the condition of his mind, on the day of the
homicide, before, at the time of, and subsequent to, its
commission, in respect of that act, in connection with
his supposed rights to the land which was the subject of
the controversy, and the act of the deceased in interfer-
ing with those rights ;—all designed to show that on
that day his mind was in such condition as to be void of
that malice which was an essential ingredient of the
crime with which he was charged. The question asked
by the prosecuting attorney tended to elicit a declaration
upon his part, or lay a foundation for proof of said
declaration, showing a state of mind different from, and

inconsistent with, that testified to by him in chief, and which was the subject of continual reference by him in that examination. How, then, can it be said, that by it, he was being cross-examined as to a "matter not referred to by him in his examination in chief?" This exception cannot be sustained.

II.   The defendant's two sons were present with him at the time of the homicide.   They were examined as witnesses, at the inquest before the coroner's jury, before the grand jury, and were introduced and testified on the trial on behalf of the defendant.   It is urged that the cross-examination of these witnesses in regard to their previous evidence before those juries was improperly conducted.   The course that this examination took can be most satisfactorily illustrated by setting it out in full as to one of these witnesses.   Elger West, the oldest son, having been examined in chief by defendant's counsel and cross-examined by the prosecuting attorney upon the matters to which he testified in chief, on his examination continued as follows:  "I am twenty years old ; was nineteen then.   I testified before the coroner's jury, and also before the grand jury, in regard to this case."   (Here a paper was shown to witness purporting to be the written evidence of witness, taken before the coroner's jury, and witness asked if a certain signature was his).   Witness answered :  "I think that is my signature."   (Here a paper was shown to witness, purporting to be the written evidence of witness, taken before the grand jury, and witness was asked if a certain signature was his).   Witness answered :  "I think that is my signature."

The prosecuting attorney asked the witness :   "Did you not testify before the  coroner's jury, as follows (quoting from a paper, purporting to be the written evidence of witness, before the coroner's jury) :   'I was with my pa last Thursday or Friday, when we went through Mr. Reynolds' field ; pa stopped and talked

with Mr. Reynolds; Walter and I went on; I heard Mr. Reynolds ask pa where he had been; pa told him he had been setting posts on his eighty of land; I heard nothing else'"? To this question defendant objected, and the objection being overruled, defendant excepted. Witness answered: "I did not testify that way."

The prosecuting attorney (quoting from a paper supposed to be witness' testimony before the coroner's jury) asked witness the following question: "Did you not testify, before the coroner's inquest, as follows: 'I live on the east side of Horse creek; I went from home to the Walser farm, to plow around the west eighty, and burn it off; Walter, my brother, and my father, went with me, in the wagon; pa left me and Walter, at the corner of Mr. Reynolds' farm, and went across to the west eighty of the Walser farm; Walter and I got there first; Walter and I took a plow and a musket; we drove into the field, and unhitched the team, and took the plow out of the wagon'"? Question objected to, and objection overruled, to the overruling of which defendant, at the time, excepted. Witness answered: "I did not make the statement exactly that way; I did not say we got there five minutes before he did; I did not say he came in at the stacks; I did not say I went; I said we went; I did not say we drove in, and took the plow out of the wagon, before father got there."

The prosecuting attorney (quoting from a paper, purporting to be the written evidence of witness, before the grand jury) asked the witness: "Did you not make the following statement, before the grand jury, in the presence of A. Warden, and others: 'I got to the eighty about five minutes before father did; Walter and I drove the wagon in at the gate, at the southwest corner of the eighty, and unhitched the team, and took the plow out of the wagon; while we were doing this,

father came in at the stacks, about eighty, or one hundred yards east of us, and came on down to the corner where we were'"? The question was objected to, and objection overruled, to the overruling of which the defendant, at the time, excepted. Witness answered: "I did not say we got there five minutes before he did; some of the words are not mine; I did not say father came in at the stacks."

The prosecuting attorney asked witness the following question: "Did you not testify before the grand jury, as follows: 'I did not see any weapons with Reynolds; do not think Reynolds did anything towards hurting my father; his horse kept moving around all the time they were talking; as soon as father shot, R. fell off his horse; did not speak; the horse ran home; when father first jerked the gun up, I hallooed to him not to shoot, but he made no answer'"? To which question defendant, at the time, objected, which objection was, by the court, overruled; to the overruling of which defendant excepted. Witness answered: "There are words in there that don't sound like mine; I did not say it just that way; I testified that I did not see any weapons; I did not testify in that way, about Reynolds doing nothing towards hurting father; I did not say, 'don't shoot that man'; the balance is about right."

The prosecuting attorney (quoting from a paper purporting to be the written evidence of witness before the grand jury) asked witness the following question: "Did you not make the following statement before the grand jury, in the presence of A. Warden and others, in regard to where you went out of the field: 'When my brother and I drove out, we passed about fifteen feet to the west of Reynolds, and then turned east, and drove about fifteen feet south of him. We did not stop the team'"? To this question defendant objected, which objection was, by the court, overruled, to the overruling of which defendant, at the time, excepted. Witness answered:

"I do not recollect of saying anything about the team; I said I supposed it was about fifteen feet."

The prosecuting attorney (quoting from a paper purporting to be the written evidence of witness before the grand jury) asked witness the following question: "Did you not testify before the grand jury as follows: 'Reynolds was on the ground, moving his right hand up and down by his side' "? The question was objected to, and the objection was overruled; to the overruling of which defendant, at the time, excepted. Witness answered: "I did not say his right hand; I said I saw him move his right leg."

The prosecuting attorney (quoting from a paper purporting to be the written evidence of witness before the grand jury) asked witness the following question: "Did you testify before the grand jury, before A. Warden and others, as follows: 'They talked rather loud at the last, as though they were getting mad, and right then father got the gun and shot' "?

Hoyt Humphrey, called by the state, testified: "I was a member of the grand jury about March 3, 1886; Elger West was examined about the killing of Reynolds." (Here a paper was shown to witness purporting to be Elger West's written evidence before the grand jury). Witness said that it was the statement of Elger B. West before the grand jury, and written down by Mr. Timmonds. "I state that it is."

The prosecuting attorney offered to read in evidence the statements, identified by witnesses Warden and Humphrey as the evidence of Elger and Walter West before the grand jury. To the reading of which defendant objected, and the court ruled that only such parts of said statements could be read as the attention of Elger and Walter West had been called to; and then the prosecuting attorney read in evidence, against the objection of defendant, the following extracts from the statement of Elger West, viz: "I got to the eighty

about five minutes before father did; Walter and I drove the wagon in at the gate, at the southwest corner of the eighty, and unhitched the team, took the plow out of the wagon ; while we were doing this, father came in at the stacks (seven or eight of them), about eighty or one hundred yards east of us, and came on down to the corner where we were.  *  *  *  Do not think Reynolds did anything toward hurting my father.  *  *  * When father first jerked the gun up, I hallooed at him not to shoot.  *  *  *  When my brother and I drove out, we passed about fifteen feet to the west of Reynolds, and then turned east, and drove about fifteen feet to the right of him; he was on the ground, moving his right hand up and down.  *  *  *  They talked rather loud at the last, as though they were getting mad, and right then father got the gun and shot." After the reading of which, the court informed defendant that he could have all the contents of the paper read, which he declined.

A. F. Ryan, a witness for the state, testified : "I remember the coroner's inquest held on the body of Samuel K. Reynolds ; I was acting coroner; the inquest was commenced on the first day of March and adjourned until the second ; Elger B. West and Walter West were examined as witnesses ; I reduced their statements to writing." (A paper was here shown witness). "This is the statement of Elger B. West, written by me and signed by him in my presence."

The prosecuting attorney then read in evidence, against the objections of defendant, the following extracts from the statement of Elger B. West before the coroner's jury, viz : "Walter and I drove into the field, and unhitched the team, and took the plow out of the wagon." After the reading of which the court informed defendant that he was entitled to have the whole of the paper read in full, but he declined. "I was with pa last Thursday or Friday, when we went through Mr.

Reynolds' field; pa stopped and talked to Mr. Reynolds; Walter and I went on; I heard Mr. Reynolds ask pa where he had been; pa told him he had been setting posts out on his eighty acres of land; I heard nothing else they said.''

When it was proposed to introduce the previous sworn statements of the witness, claimed to be inconsistent with his statements then just delivered in evidence, the defendant had the right to insist that the particular inconsistent statement be pointed out to the witness, so that he might have an opportunity to explain it understandingly, and that it be read in the light it appeared when taken in its proper connection with the whole of such statement, so that the force and meaning of such previous statement, as well as his explanation thereof, might be properly appreciated by the jury. 1 Greenl. on Evid., secs. 462–3; *State v. Phillips*, 24 Mo. 475; *Prewitt v. Martin*, 59 Mo. 325; *Norris to use v. Brunswick*, 73 Mo. 257; *State v. Talbot*, 73 Mo. 347. There can be no question that the attention of the witness was called directly to the particular statement that was claimed to be inconsistent with the evidence he had just delivered on the stand, for the prosecuting attorney read the very words of that statement from the paper, identified by the witness himself and jurors as containing his evidence given previously before the coroner and the grand jury. And if the defendant's case was in any way prejudiced by reason of the fact that the whole of that evidence was not read to the witness or the jury before he answered, or afterwards, he has himself only to blame; when the witness was asked if he did not testify to the statement quoted from his evidence, the defendant simply objected, without assigning any reason for his objection. If he had then given as a ground of his objection that the witness ought not to be required to answer until the whole of the evidence had been read, the court would doubtless have required it to be read

then.   As he gave no reason *then*, he cannot be heard to assign one *now*.   It is evident on the face of this examination, that if the defendant on the trial had desired to have the whole of the evidence of the witness read to the jury, he could, by pursuing the proper course, have had it read at any time when he was entitled to it, but he seems to have thought it would not benefit his case to have the whole evidence read to the jury, for when the prosecuting attorney offered to do so, he objected, and when the court tendered him the privilege of doing so, he declined.   We see no ground on which this complaint ought to be sustained.

It is urged, however, that the evidence of a witness before coroners' and grand juries, written down by other persons, and subscribed to by the witness, are inadmissible as evidence for any purpose, and that the trial court committed error in permitting the extracts from the evidence of the witnesses Elger and Walter West to be read to the jury.   This question is not before us on the record, as no reason was assigned for the objection to the admission of this evidence and no exception taken to the action of the court in overruling the objection.

Finding no reversible error in the record of this case the judgment of the circuit court is affirmed.   All concur.