The State v. Thomas.

THE STATE v. THOMAS, *Appellant.*

1. **Murder:** INSTRUCTION: MALICE. An indictment for murder in the first degree, and an instruction defining the term, "malice," approved.

2. **Criminal Practice:** TWO COUNTS: INSTRUCTION. Where an indictment for murder, containing two counts, charges but one offense, one count stating the instrumentalities by which the killing was done, and the other stating the same were unknown, an instruction embracing both counts, and not discriminating between them, is proper.

3. ———: EVIDENCE. Evidence given on the trial, of the finding of a bloody handkerchief a week after the murder, about a quarter of a mile from the place where the dead bodies were found, and of the finding of other articles of clothing about the same distance from the same place about two years after the murder, is inadmissible against defendant in the absence of evidence connecting him with the articles.

4. ———: ———. The admission of improper testimony in criminal cases is not cured by an instruction for its exclusion.

5. ———: ———. Nor is it proper to admit evidence prejudicial to defendant, the relevancy of which is not apparent, even upon the understanding that it is to be excluded, if the evidence afterwards admitted does not disclose its competency.

6. ———: ———: GRAND JURY MINUTES. The minutes of the testimony of a witness before the grand jury are inadmissible in evidence on the trial for the purpose of contradicting or discrediting such witness.

7. ———: ———: GRAND JUROR AS WITNESS. The grand juror, however, is, under the statute ( R. S. 1879, sec. 1791 ), a competent witness, the proper foundation being laid, to show what the testimony of the witness before the grand jury was; the consistency of the testimony of the latter witness, on the two occasions, being a matter for the trial jury.

*Appeal from the Saline Criminal Court.*—HON. JOHN E. RYLAND, Judge.

REVERSED AND REMANDED.

*J. P. Strother* and *Davis & Wingfield* for appellant.

(1) The indictment is wholly insufficient. It fails to charge the homicidal act, itself, was done feloniously, etc. *State v. Herrell*, 97 Mo. 107. See also *State v. Sundheimer*, 93 Mo. 313. (2) The court erred in giving state's instruction number 1, in defining malice, and in not discriminating between the counts of indictment. Also in giving state's instruction number 4, in that it allows the jury to consider "facts and circumstances as detailed in the trial of this cause;" thereby authorizing them to consider other than sworn testimony. It does not confine them to the evidence. (3) The court erred in number 5, by telling the jury that, if they have a reasonable doubt of defendant being present when and where the crime was committed, they should acquit, virtually tells them the converse of that— that, if they have not a reasonable doubt thereof, then they should convict—whether they believe he did or helped to do the killing or not. (4) The court erred in refusing instruction 9, asked by defendant; for it is unquestionably the law, and a proper and necessary qualification or amplification of the fourth, given for state. See instruction in *State v. Jackson*, 95 Mo. 658, and remarks of court thereon. (5) The court ought to have instructed jury as to necessity for corroboration of extra-judicial confession. *State v. Brooks*, 92 Mo. 595 ; *State v. Banks*, 73 Mo. 592; *State v. Palmer*, 88 Mo. 568; *Craft v. State*, 3 Kansas, 450. (6) The court erred in admitting the so-called written statement of witness, Leta Thomas, before the grand jury. Under our statute the rule is absolute, sworn secrecy. See last clause of oath, Revised Statutes, 1879, section 1775. To this there are but two exceptions: (*a*) They may be required to testify "whether the testimony of a witness examined before such jury is consistent with, or different from," the evidence given by such witness before

such court, and (b) upon complaint or trial for perjury. Under the decision in *Tindle v. Nichols*, 20 Mo. 326, it is only in case, and in the manner, pointed out in section 1791, that they can testify at all; for this section corresponds to section 15 referred to by the court in that case. *Beam v. Link*, 27 Mo. 281. (6) Again, the law does not require minutes of evidence taken before a grand jury to be signed by witness. R. S. 1879, sec. 1780. She had been unlawfully required to sign this "minute of evidence," and then it was unlawfully used in evidence to discredit her, and to help convict her brother of capital crime. (7) The evidence of the finding of a bloody handkerchief by Charley Adams was wholly irrelevant, and mischievous beyond calculation. There was absolutely no evidence—not even circumstantial—connecting defendant with this handkerchief. So of testimony of Binghaman, as to drawers and overalls. (8) The evidence was insufficient to convict. The so-called confession was not reasonable, or probable, and insufficiently corrobated. *Robinson v. State*, 12 Mo. 592; *State v. Scott*, 39 Mo. 424; *State v. German*, 54 Mo. 526; *State v. Patterson*, 73 Mo. 695; *State v. Dickson*, 78 Mo. 438; *State v. Castor*, 93 Mo. 243.

*John M. Wood*, Attorney General, and *A. F. Rector*, Prosecuting Attorney, for the State.

(1) The objection to the testimony of James H. Binghaman, who testified that, in the summer of 1886, he lived upon the premises where Lowry was killed, and that, "while cutting brush north of the creek, he found a pair of overalls and drawers," and describing them, is without merit, and the testimony competent; the clothing was found in sight of the Thomas residence, and right on the route defendant would likely take from the place of the killing to his own home. It was a circumstance to be considered in the case by the jury, and was properly admitted. (2) The objection to testimony of

Charley Adams to the finding of a bloody handkerchief north of the Lowry place soon after the murder was competent. (3) The objection to the reading in evidence the statement of Leta Thomas, signed by her, as made before the grand jury at September term, 1887, is not well taken. Leta Thomas having testified in behalf of the defendant, on cross-examination, stated that she testified before the grand jury in September, 1887; her statement made upon that occasion was written down at the time and signed by her; on the trial of this cause it was shown her, and she admitted that she had signed the same, and, after showing that she had made the statement, it was read to the jury for the purpose of contradicting her. This was proper and competent. *State v. Matthews*, 88 Mo. 121, and cases cited.

BRACE, J.—At the March term, 1888, of the criminal court of Saline county, the defendant was indicted for murder in the first degree. The indictment, in two counts, charges him with having murdered John Lowry on the eleventh of October, 1884, in said county. He was arraigned, plead not guilty, and the case was continued until the September term, when it was set down for trial on the second day of January, 1889, at which time he was tried, found guilty of murder in the first degree, and sentenced to be hanged. His motion for new trial, and in arrest of judgment, having been overruled, he appeals, the circuit court staying the execution until his appeal be heard.

So far as the personal knowledge of any of the witnesses who testified in this cause goes, the last time that John Lowry was certainly seen alive, was on the evening of Saturday the eleventh of October, 1884, when "the sun was about a half an hour high." The evening was "dark and rainy;" he was in his pasture driving a cow, and had on a "gum coat and overalls." About sunset of the same day, or, a little before, a man was

-seen standing in the front door of Lowry's house, whom one of the witnesses supposed to be Lowry, but, as he was at a distance, and the view obstructed by trees, it may, or may not, have been he. On Monday, the thirteenth of October, the mother and sister of John Lowry's wife, about two o'clock in the afternoon, went to Lowry's house. They found a cow in the house, in the east room used as a dining room and kitchen, the table was set, chairs around it, the dishes indicating that a meal had been eaten. On the window sill there was a coal oil lamp, the oil consumed, the light gone out. In the adjoining room, on the bed, freshly ironed clothes were found lying. No living soul was found. The daughter went to the door, hallooed two or three times, when Lowry's bird dog came to them. "He acted strangely, went to the door and looked back, went down the steps and looked back again, ran to the fence, hopped over, and waited." The daughter followed him, to the dead body of John Lowry clothed in a gum coat and overalls, about one hundred and fifty yards northwest of the house, and about twenty or thirty feet northwest of the barn, lying on his breast, with his skull crushed in on the right side, just above the ear, and above a puncture as if made with a blunt instrument, and "two small cuts on the left side of his neck," his hat lying, also punctured, eight or ten feet southeast of him.

The alarm was given, some neighbors came, and, soon afterwards, the body of John Lowry's wife was found dead, behind an old hen house about fifty or sixty feet north of the house, her head crushed, the back of the skull split open as if with a sharp wedge-shaped instrument, after the body had fallen; decomposition had set in when the bodies were discovered, and the physician, who examined them soon after their discovery on Monday, expressed the opinion that "the wounds on both Mrs. Lowry and John Lowry were made

on the Saturday evening before." He testifies that he formed this opinion from the condition of the wounds and the circumstances surrounding the case at the time, the bodies having been rained on since they had fallen, and there having no rain fallen after Saturday night. "I remember there was no rain between that time and the time I made the examination of the bodies. He (John Lowry) must have been killed Saturday evening, there had been a rainfall since the body had fallen. The blood had been washed away from the lower part of the face." Another witness testified: "It had rained on the body where it laid. The mud had been washed off his shoes, and the wrinkles in the gum coat showed it had rained since the body fell."

The other evidence tended to show that it commenced raining Saturday evening between two and three o'clock, continued in showers, until after dark, probably until about eight o'clock, when it ceased, and did not rain any more until after the bodies were found. The whole evidence tends to show that John Lowry and his wife were murdered between sundown and eight or nine o'clock Saturday evening, October 11, 1884.

At the time of the murder, Lowry and his wife were living alone in their little two-roomed house. About fifty yards south of their house, was a public road running east and west. North and east of the house, and near along by the barn, ran Straddle creek. Southeast from the barn, it crossed the public road west of and between Lowry's premises and a neighbor by the name of Wm. J. Adams, whose home was east of the creek, and of Lowry's, about a quarter of a mile. Northeast of Lowry's house, across the creek, and distant about three-fourths of a mile, was the home of John Thomas, defendant's father. The defendant, then a youth between nineteen and twenty years of age, was living with his father, mother, two brothers and two sisters.

The discovery of the murdered bodies of Lowry. and wife created great excitement, and, in a short time, almost every man in the neighborhood was there. No further developments seem to have been made on that day, or the next. On Wednesday, however, in the creek, northeast of the barn, and close to it, an axe, and a part of a wagon brake, being an iron bar, about two feet long, one inch wide, and one-half inch thick, were found, both having blood on them. They were fished out of the creek by witness Miller, who says he found tracks near the edge of the water, at the place where the axe and bar were found, as if some one had walked up to the creek and stepped back. The track was about the size of a No. 8 boot. There had been a good many people there. Thinks there had been rain since the track was made. He followed the track to a foot-log, crossed over creek and found same track; followed it out of the timber, going north. About two hundred yards from the place where the axe and rod were found, he measured the track with a stick, which he notched, but afterwards lost. Doesn't know whether he got the exact size of the track or not. About a week afterwards, in Marshall, he measured tracks of the defendant, and says they "corresponded very well." About a week after the murder, a witness found a white handkerchief, with a red border, "with blood on it," which looked like hands had been wiped on it, about ten steps from a road, and about a quarter of a mile northwest of Thomas' house. In the summer of 1886, a witness found a pair of drawers and overalls in some buck bushes that he was cutting, north of the creek, about a third or a fourth of a mile southwest from Thomas' house. The drawers were cotton flannel, and "pretty much rotten." "The drawers were dirty. Can't say they were bloody." ·

The foregoing statement contains substantially the positive and direct evidence for the state. The connection of the defendant with the murder is sought to be established by his extra-judicial confessions, criminating admissions, conduct and contradictory statements, which will be now given as briefly as possible.

On Sunday, after the murder, and before the bodies were discovered, the defendant took dinner at the house of the said William J. Adams. In a conversation, which he then had with Mrs. Adams, in regard to a noise which she heard on the creek the night before, she said to him: "Rid., was you out coon-hunting, Saturday night?" To which he replied, "No, he was in town, Saturday night. If he had been coming home an hour earlier, or later (the witness didn't remember which), he would have heard the noise and found out what it was." The defendant went home from Adams,' and arrived there about one o'clock, went up to the boys' room, where a neighbor youth, by the name of Chat. Lacey was. Lacey, on leaving, a short time afterwards, left his knife in the room.

John W. Bartlett, for the state, testified that, on October, 1884, he was city marshal of the city of Marshall, and John R. Cason was then deputy sheriff. First heard of the killing of Lowry on Monday. Was out there next day, Tuesday. "Saw a good many tracks along the creek. I crossed on north side, found large tracks along fence going north, toward Thomas' house; creek was crossed on water-gap and log, water-gap is a little east of north of Lowry's residence. Did not know defendant before. Cason was with me. We conversed with the defendant at that time. First saw him on Thursday, at his father's premises. Cason told defendant we were investigating the Lowry murder, and talking to every one we could about it, and asked him what he thought of the killing. He said he thought it was done by a man intimate with the family. He

thought the man was killed first, and then the woman. When we came up to where he was, he was very much excited. We caused him to come over the fence to where we were, which he did, and he laid down and held to the grass. In answer to questions, said he was hunting on the creek in the forenoon, at home in the afternoon, and went to bed at eight o'clock. That he could prove it by his father. Cason said that he could prove, by two men, that he was on the creek near Lowry's, Saturday evening. Defendant said he went down on the creek late Saturday evening to get a knife he left down there Saturday morning, which he used in skinning a squirrel. He gave us the knife. He said he saw and talked with Gauldin and his son, as he came back. Said they were gathering corn, and could prove by them what time he came home. We left defendant at home and came to Marshall. Next day got warrant, went out and found him at his father's. He went with, and showed, us where he said he left his knife on Saturday. He said that the reason he went after knife was that if it was found down there it would go harder with him. We brought him to town that evening and turned him loose, and, later in the evening, we took him back to his father's house and turned him loose. Defendant and Cason went up stairs to look at defendant's clothes. Late Saturday evening we went to Thomas' house and brought him to town. We went by W. J. Adams'. He asked Adams if he had told Cason that he said that he was in town Saturday night. Adams said 'yes.' Thomas said it was a lie. * * * Cason gave the knife to J. W. Lacey."

On cross-examination, witness said: "Defendant told Cason he would show him the clothes he wore Saturday evening. When Cason told him he could prove by two men that he was on the creek Saturday evening, it was a trick of Cason's to catch him. Cason had been in office sixteen years and was working in criminal

cases, and was a very expert detective.   I swore out the warrant.   Cason read it to him, Friday morning, on the creek about where he said he found the knife.   We saw no tracks there.   It had rained since, and the rain would have filled up the tracks.   We found him at his father's Friday and Saturday at work, wearing the same clothes as when we first saw him.   We put him in jail to await grand jury.   He was discharged and has lived with his father since.   I have seen him frequently here in town. I have been before every grand jury, except one, since the killing.   Cason asked him a great many questions. Some catch questions.   Cason told him that Meredith, defendant's brother, said he was not there to help him feed.   Meredith did not tell us anything of the kind. We did not want the house watched as we did not care if he got away or not."

This witness was corroborated by Adams in the statement that defendant denied that he told Adams he was in town Saturday night.   Martin Gauldin testified that he and his son were gathering corn in his field about half a mile north of Lowry's and west of Thomas' place late Saturday evening, and that he did not see or talk with defendant that evening.   J. W. Lacey, the father of Chat., testified that he saw a knife in the possession of Cason and Bartlett that belonged to his son Chat., and Chat. Lacey testified that Bartlett had the knife that he left at Thomas', and he afterwards got it from the defendant.

The facts, as they appear in the evidence thus far, seem to have been well known in the community, as well as the fact that a large reward had been offered for the murderer, and, although, as appears from the evidence of Bartlett, he had been before every grand jury but one since the killing, yet the defendant was not indicted until March, 1888, nearly three and one-half years after the murder.   An explanation of the fact that he was then indicted, and not before, may perhaps

be found in the evidence of the following witness for the
state :

Andrew Bogle, for the state testified : "Am about
thirty-two years old. Live now near Orearville. In
1884 lived at Hugh Chrisman's. I lived out here near
six miles southwest of here close to Malta Bend road,
northwest of Marshall. Was acquainted with John
Lowry. He lived near a mile straight course, nearly two
miles around the road. Don't know exactly the dis-
tance. Remember the killing of Lowry; was right this
side of Chrisman's farm when I heard of it. I believe
it was the eleventh or twelfth, somewhere, that I heard
of it on Monday. Stayed at Chrisman's till the next
March. Was acquainted with defendant in 1884.
Got home from Marshall between sundown and dark,
and was at Chrisman's Saturday night. Think it was
next day after I heard of killing that I saw defendant;
ain't certain. Two days after I think it was. Don't
know how long it was. One or two days; don't know
exactly just how long it was. It was at his father's
about one-quarter west of Chrisman's. Next saw him
Thursday and Friday; ain't sure which, in buggy with
Cason and Bartlett. Next saw him in jail; had conver-
sation with him in jail; near two weeks after I heard of
killing, don't know exactly. He asked how things
were out in the country. I told him things were a little
bad out there, people round there suspicioned him
mighty strong, he was in a mighty bad fix. He asked
who had suspicioned. 'They ain't got anything straight
on it,' I says, 'I don't know as there is anything straight,
people suspicion you mighty strong. Every body is
talking about it. All our people talks just that way.
You are in a bad fix unless you prove out, that is the
only chance.' He said he could not prove anything, he
just had to stay there. Said they came out here to
Marshall, and Virg. was young, they got her kind of
excited, and she told he was not at home. Said he

would just sit down and let them prove it on him, he did not think they could do that. I next saw him a few days after he was turned out of jail, out at Mr. Thomas'; saw him every week or so; we were around together some, once or twice a week. Next talked to him about killing the spring after that, about April, I suppose; said he got out all right, they could not prove anything; he was all right then he supposed. He talked like he was going to leave the country. I believe next conversation was latter part of summer or fall, at Marshall. He said he was all right, they had got no hold on him; he was not afraid of any of them. Next talk was about the first of December; wanted to know if I had been before the grand jury; said he thought they were trying to put it on him. Next talk was about the first of January, last, at Mr. Thomas'. Said he heard they were working on it again; they had tried to put it on him and had failed. They had accused him of paying Cason; that was nobody's business. About two weeks after that I was then talking to him about it, and he said they were working on it, and he said he was not afraid of them, though they accused him of it, but none of them don't know it. He had not told them, and was not going to tell it; he was going to do nothing. I told him he need not mind telling me anything about it. He said he saw Gauldin over there in the field that evening, and he thought Gauldin saw him when he went down to Hudson's woods; he was down there squirrel-hunting that evening. Along in February, latter part of January, or first of February, I ain't certain which, he was talking about it, and said they had a detective there passing off as an album peddler. He said he did not know him. I asked him what sort of a looking fellow he was. He said he was a slim, smooth-faced fellow. I says I thought I knew him, I thought it was Mr. Stipes. He wanted me to promise to tell Stipes, for him, he would buy four albums, one for himself and one for each of

his friends, and he said he would never sell any more. He wanted to know of me if I would lend him my revolver. He said Lowry was killed; that he was no account and he did not care. If he knew who was working it up, he would kill them off; they need not bother him about it. I went on to tell him, I told him I suppose they were working on it, that that was that fellow's business. I guessed he was a detective, and I told him that I knew that fellow, that it was Stipes. He said, well, if he came around there he would never tell nothing that he had done. He said if he did kill him he would not tell it, he would not tell Stipes. I said, no, it would not be very safe telling Stipes; I says that is what he is working at. I says if you tell anybody about that, you had better tell some of your best friends. He said he would not trust to anybody much. I says it will be kind of particular business going to trust it with everybody, and he talked like it would. He says to me, wanted to know if I thought it was him, and I says, yes, I kind of thought it was him. Well, he said, he never denied it, and I told him, no, he never denied it to me, and he went on and told me what he had done."

Q. "Just give his conversation."

A. "He said he hated to kill them; he said he hated to kill Mrs. Lowry. Rid. talked like he had been fooling around there right smart with John's woman, and John kind of objected to it, and was getting cross and talked to his wife like he was going to shoot him if he came around there, and he said he thought he would kill John and not hurt her, and he went down to the woods that evening with the intention. That he was squirrel-hunting and heard John chopping, and thought he would go down there and shoot him, and he went down. John was chopping, and he saw some teams ·passing the road, and he would not kill him, he was afraid. He was afraid he would halloo and somebody would come over, and he could not get back to the house

until they would catch him. And he went on back down the creek, and talked to John awhile, and he went back up to the house and took his gun back up, and went past the corn field where Gauldin and his son, Martin, were at work in the corn field. He took his gun to the house, and went out to the old shop of Mr. Thomas and got a wagon brake that was there, and he thought he would go down there and kill him, that that would make no report, and he said he went down there. John never laid his axe down, and he was afraid to get close enough to hit him with the brake. He just walked down the creek, told John he went down and killed a squirrel and left his knife on a log, and he went down to the house and talked to John's wife, and fooled with her right smart, and he said John came in after awhile. John did not talk well, he was uneasy and out of humor, and he stayed there quite awhile, and John started to go after his cow. It was kind of sprinkling rain a little, and he told John he believed he would go home, and John told him it was no use being in a hurry, and he asked John if he would loan him his gum coat, he did not want to get wet, and John told him as soon as he got his cow he would lend him his coat, and John went after his cow, and he stayed there and fooled with his woman awhile until he came back, and he said she told him John was mad at him, and he said he told her he was going to kill John, and she said she did not care. And John came back and he staid there awhile, and John started out to get a load of wood and he started with him, and John went out to the fence, and John's axe was setting side of the fence or gate where he went out, and he picked it up as he went out. He thought he would just knock him in the head with it, and John asked him what he was going to do with it, and he said he swore an oath and told him he would show him what he was going to do with it, and he said John broke out to the road. He was in the yard and John outside; he

ran up to the fence ahead of John to keep him from going to the road, and John halted and came back into the gate where he headed him off, and he went towards the barn, and he followed him out and ran him close to the barn, and there he caught up to him and hit him with the axe and knocked him down, and then he hit him a lick or two and then went back to the house and told John's wife what he had done. He said she did not have any sense; she commenced to halloo and run out in the yard and told him he ought not to kill John, they would take her up for having a hand in it, and he said he hated to kill her but he had to do it to keep her from giving him away. She hallooed and raised the whole neighborhood. He had to kill her to keep her from giving him away. I said it was too bad to kill the woman, John was not worth much, but I says it was mighty bad to kill the woman, and he says then it was too bad, he hated to kill her, but it was better to kill her than to be hung for killing John, and he says she was hallooing and cutting up and raising the whole neighborhood, and she would give it away. I says, yes, I suppose she would give it away if she was hallooing and cutting up that way."

On cross-examination the witness stated : "That the defendant said he killed Mrs. Lowry with axe, then started to go toward the road, thought he heard somebody coming down the hill out there by Thomas', and he whirled and went back and said he gave John one lick as he passed him for fear he was not dead, and went down to where we crossed Straddle creek going to church and threw his things in the creek, and crossed and went towards home, in Hudson's field, and went on close up to corner of field and pulled off his shirt and threw it into the buck bushes. Said he did that because it was bloody from killing Mrs. Lowry. This conversation about the killing of the people was at John Thomas'. I was there; was taking my revolver up to him ( Rid.

Thomas ); he requested it of me, had told me what he was going to do, was going to shoot Stipes. This conversation took place about fifty yards, as near as I can guess, from the house, at Thomas' front gate. It was about the last of January or first of February. We stood there in that conversation about three-quarters of an hour, as near as I can guess, late in the evening about dark. Pack. Hutchison was there. Pack., Rid. and I started to the gate together, and Pack. parted with us at the gate  *  *  *. I took dinner at Thomas' the day of the confession. There was a funeral that day and dinner was late. I never was before the grand jury. I knew there was a reward offered for the discovery of the murderer. I was not working for it when I told Rector. I went to Rector voluntarily and began the conversation myself. I told Stipes about the conversation the same day I told Rector, and an hour or so after, this was the first time I had seen Stipes after the confession  *  *  *. I had a talk with Rid. afterwards in jail, and he told me if I did not give him away he was all right. I talked to him as a friend. I did not tell him I had told it on him. I knew at the time the confession if true would hang him, if I could make it stick. I went to the jail twice for the purpose of spying on him.  I was well acquainted with John Lowry and his wife, lived right by them. I know John Jones. Don't remember having any conversation with him about the Lowry murder. I don't remember whether Jones said there was a reward of twenty-one hundred dollars, and that I said : ' It would be a nice thing for a young man to get.' ''

For the defense, Pack. Hutchison testified that he saw Bogle at Thomas' the Sunday that Mrs. Arnold was buried ; that he took dinner there and stayed about fifteen minutes after ; that Bogle was standing out in the yard at the wood pile, talking to Rid. Thomas. ''He was out there about fifteen minutes when I went out

there. He asked me if I was going home. He got on his horse and started home; left Rid. at wood pile. Rid. did not come to gate, don't think they were out over fifteen minutes.''

John Jones testified that some time after March 11, 1887, going by Lowry's house in a buggy, he had a conversation with Bogle about the killing. ''I told him there was reward of twenty-one hundred dollars, for the arrest of Lowry's murderer, and that it was a pretty good thing for a boy to get. He said he thought so too, and said he thought he could find out who did it.''

Ridley Thomas, defendant, testified: '' I was born near Fairville, in this county, and am twenty-four years old; lived with my father, where he now lives, about nineteen years; was living with him in October, 1884. I first heard of the Lowry murder on Monday, October 13. I was helping my father work the road near our house. I think it was about two p. m. when J. W. Adams told us about it. My father went to Lowry's at once, and told me to gather some corn to feed the hogs, which I did, and then went to Lowry's place myself; sun was about two hours high when I got there. Staid till about dusk and went home with some of our women-folks; I went back to the Lowry house, Tuesday evening. On Saturday morning, October 11, I went down on Straddle creek, due west from our house, to kill squirrels; I went from there down the creek, which is away from the Lowry house, and returned about dinner time; I caught my mare about two o'clock and went to Marshall; got there about three or half past three o'clock; staid an hour or two and started home; went by my sister's, Mrs. Sam. Short's; think it was about five o'clock when I got there; my sister, and my sister-in-law, Mrs. George Thomas, were there. I ate supper and staid but a short time. I remember seeing my mother while in town on north side of square: I bought some newspapers at Franklin's book-store, the

postoffice room, and had them with me at Short's and took them home; went directly home from Short's; it rained on me going home, and part of the time I went in a lope; I got home, turned my horse loose, and think as I went to the house I fed some pigs. Went in house on the east side, into the dining room. All the family, except father, John Thomas, were there. I staid there about fifteen or twenty minutes, pulled off my coat and boots and went up stairs to my room; one of my sisters came up and got the lamp, and before that came up and got a paper. From that time until the following Thursday I was at home, except went to Sunday school on Sunday and ate dinner at Adams' about noon; from there I went home; Chat. Lacey and my brother was there, and may be George Fisher. I think I borrowed Chat. Lacey's knife; he went off and forgot it. I went over to Bill Fellows that evening and then to Union Church, thinking there would be singing there, but there was not. I then went up to Bill Fellows' and staid half an hour. Mrs. Adams came up and we talked awhile, and I then went home. (He gave what he did Monday and part of Tuesday.) Tuesday, I gathered some apples. Wednesday evening commenced work on the fence near the orchard; Thursday, saw Cason and Bartlett there; I was down on my knees digging post holes; Mr. Cason walked up two or three feet of me, put his arm on the top rail of fence and rail broke off; he spoke to me and asked how I was getting along; he asked me to get over the fence, he wanted to talk to me; said he was working up that murder case, and asked me where I was. I told him where I was; the same that I have told here; he got up and went off and told me if I heard anything to let him know. I told him I would; Friday morning, I was still at work when they came out again. Cason asked me to go with them to Straddle creek, and show him some tracks. We went to the springs and got a drink and sat down

to rest awhile, all three of us set down. He said he had a warrant for me; he would not let me see it; he said he had to take me to Marshall; I wanted to go home and change my clothes, but he said my clothes were good enough. I came to town with him; he turned me loose down by Robertson's stable, northwest of the court house, and told me he would not put me in jail, and that I had better skip;. I might get into trouble. I then went to Gower's restaurant. I saw Mr. Gauldin in the center of the street. Cason come up right up behind me. I don't know where Bartlett went. I staid in town the most of the evening; I left about an hour by sun; Cason and Bartlett, John Patterson and a little fellow called Woodson went with me. I went back home; I don't know where Cason and Bartlett went from there. Cason wanted to look at my clothes; he looked at all of them and said he could see nothing wrong with them; he said he would give me from then until the next day at four o'clock p. m. to get away. The next evening, Saturday, he brought me to town and put me in jail; I staid there about six weeks; Bartlett asked me for my knife; the knife I gave him was Chat. Lacey's; I had a knife of my own, but not with me; I used it Saturday morning down at Gauldin's pasture where I killed the first squirrel; I left it there; I took it out where I first shot the squirrel to cut a stick to put through the squirrel's hind legs; I gave Chat. Lacey's knife back to him some time after I was released; it was a black-handled knife, and had two blades. I know Andrew Bogle; I have known him five or six or seven years; at the time of the killing he worked at Hugh Chrisman's; I saw him at different places; I saw him at my father's house, I used to see him there often; in December, 1887, I saw him in Marshall; I saw him Christmas night at our house; we talked about Mr. Stipes; he asked me if I knew Mr. Stipes; I told him I did not; he asked me if I had seen

an album peddler up there, he told me he was a mean man and to have nothing to do with him ; I remember the day Mrs. Arnold was buried ; I know it was on Sunday ; I saw Bogle that day, I had a conversation with him between the house and gate ; we talked about ten minutes, I suppose ; he told me he had left a revolver there, he said Dick Hickman, George Stendard and Horace Stipes were coming up there to string me up ; I told him I had nothing ; I got the revolver and put it in the kitchen ; I did not tell Bogle in any conversation that I killed John Lowry and wife ; I never at any time told him so ; I know John Lowry ; I may have known him a year ; I was not acquainted with Lowry's wife ; I was never in Lowry's house ; I had never seen her except at a distance ; before the killing I had never been nearer the house than the fence ; I saw the wagon brake that John Cason had ; I had never seen it before ; I never saw the axe ; I did not kill John Lowry ; I did not kill his wife."

Cross-examined : "About a week before the killing, I went by Lowry's to borrow some caps from John Lowry. Ed. Gauldin and myself and somebody else went hunting either Thursday or Friday. We did not go nearer Lowry's than about one hundred yards. I don't think when I went after the caps I was by myself. The last time I saw Mrs. Lowry, I supposed it to be her, was one day that week, I don't know what day I saw a woman in front of the house. I supposed it to be Mrs. Lowry by her being with her husband. I saw her carrying water from the spring once when we were cutting wheat, that is I supposed it to be her. I was never introduced to her ; I never spoke to her. The knife I left in the woods on Saturday I carried two or three years and traded it to my youngest brother. When I got home from town on Saturday evening, I don't remember who was there but the family ; I don't remember whether father was at home or not ; I think one of

Mr. Short's children was out there. I think they were in the dining room when I got home; I think my brother and sister had just got up from the table."

The evidence of the defendant as to his whereabouts on the evening of the murder was corroborated by his father and mother, by his married sister, Mrs. Short, by Mrs. Geo. Thomas and by his sister, Miss Leta Thomas. On the cross-examination of Miss Leta Thomas, she was asked whether she was a witness before the grand jury in September, 1887, and answered that she was.

Q. "Was your testimony written down, and did you not sign it?" A. "I don't know."

Q. (Here witness was handed a written statement and asked): "Is this your signature?" A. "Yes."

Q. "Was this written statement read over to you before you signed it by Mr. Rainey?" A. "I don't recollect that it was."

Q. "Is that your statement, read it over and answer?" A. "I can't read it."

In rebuttal the state introduced two witnesses (one of whom was Mr. Rainey), who were members of, and present at her examination before, the grand jury in September, 1887, who testified that Miss Leta was a witness before that grand jury, that she testified, and that her evidence was written down by the juror, Mr. Rainey, who testified that he wrote the statement shown the witness, that she signed it, that he wrote it down as she gave it, and it was read over to her in the presence of the grand jury, and that she signed it at the request of the foreman; but he could not remember what she testified to, or whether she was asked if it was her statement. Over the objection of the defendant, the state was permitted to read this written statement to the jury.

All the possible grounds upon which this case could be reversed are urged in the brief of counsel, and they will be noticed in the order presented.

I.   It is claimed that the indictment is insufficient in that it fails to charge that the homicidal act was done feloniously, and to state who did it.   In respect of the defect suggested, the two counts are the same, and appear in the following language of the first count: "The grand jurors, etc., on their oaths, present that Ridley Thomas on the eleventh day of October, 1884, at the county of Saline and state of Missouri, in and upon one John Lowry, then and there being, feloniously, wilfully, deliberately, premeditatedly and of his malice aforethought, did make an assault with certain deadly and dangerous weapons, to-wit: A certain axe, a certain knife and a certain piece of iron rod, three feet long, and of the weight of eight pounds, which said axe, knife and iron rod he, the said Ridley Thomas, then and there had and held in his hands, him the said John Lowry, feloniously, wilfully, deliberately, premeditatedly and of his malice aforethought, did strike, cut, crush, penetrate and mangle in and upon the body of him, the said John Lowry, giving and inflicting then and there with said axe, knife and iron rod, aforesaid, by the means of the striking, cutting, crushing, penetrating and mangling as aforesaid, two mortal wounds," etc.   It will be observed that by the insertion of the word "and" between the words "hands" and "him" the whole point of this criticism disappears; and even without the conjunction the defendant is clearly charged with having done the homicidal act, and that he did it feloniously.   There was no demurrer or motion to quash in this case, and such an omission cannot be held to be such a one as tended "to the prejudice of the substantial rights of the defendant upon the merits." R. S. 1879, sec. 1821.

II.   The definition of malice in the first instruction, given for the state, has been frequently approved by this court.   *State v. Thomas*, 78 Mo. 327; *State v. Dickson*, 78 Mo. 438.   The only difference between the

two counts in the indictment was that the first stated the implements with which the homicide was committed, the second stated they were unknown. There was no necessity for an instruction on each count, or for discriminating between them in the one drawn and given by the court. *State v. Hollenscheit*, 61 Mo. 302. The objection urged to the fourth and fifth instructions for the state are without merit, and are simply hypercritical. The refusal of the court to give instruction number 9, for the defendant, cannot be made ground for reversal in this case, in which the court gave other instructions, properly embodying the law upon the question of reasonable doubt.

III. The evidence of the finding of a bloody handkerchief, near a road about a quarter of a mile northwest of the Thomas home, a week after the murder, and of a pair of rotten drawers and overalls about a quarter of a mile southeast of the Thomas house, nearly two years after, to the admission of which defendant objected and excepted, was irrelevant and of no probative force. There is no evidence in the case tending to show any connection, whatever, between the defendant and these isolated and remote facts, or with the articles found, and the defendant's objections to this testimony ought to have been sustained.

It has frequently been held by this court in criminal cases, that the admission of improper testimony will not be cured by an instruction for its exclusion. *State v. Mix*, 15 Mo. 153; *State v. Wolf*, 15 Mo. 168; *State v. Schneider*, 35 Mo. 533; *State v. Marshall*, 36 Mo. 400; *State v. Daubert*, 42 Mo. 242. And it follows that evidence, the relevancy of which is not apparent, and which may be prejudicial to the defendant, cannot be admitted, even upon the understanding that unless the party tendering it produces other testimony, which would make it competent, it may be excluded. The trial courts are, however, invested with a large discretion

in regard to the order of proof, and if evidence is offered, the competency and relevancy of which is not apparent, and for that reason it be objected to, but is of such a nature that it may be rendered competent or relevant by other testimony, the proper course to pursue is not to admit such testimony until such competency or relevancy is disclosed by the subsequent evidence.

If this course had been pursued, it would have been readily seen, when the other evidence in this case was all in, that these facts did not tend to prove the offense or to connect defendant with it, and the evidence would doubtless never have gone to the jury. There was not, however, even an effort made to obviate any prejudicial impression this irrelevant evidence may have made by an instruction to the jury to disregard it, at any stage of the trial.

IV. The admission of the minutes of the purported evidence of the witness, Leta Thomas, before the grand jury, written by one of the grand jurors, and which she signed at the request of the foreman, was error. The ancient rule excluding the evidence of a grand juror as to any matter that transpired in the jury room, while the grand jury was in secret session in the discharge of its duties, founded upon considerations of public policy, the nature of the tribunal, and a tender regard for a juror's conscience, has been much relaxed in modern practice in those states in which the limitations upon such disclosures are measured only by the oath of secrecy which the grand juror is required to take, notable illustrations of which will be found in the following cases, as well as cogent reasons therefor: *Commonwealth v. Hill*, 11 Cush. 137; *Commonwealth v. Mead*, 12 Gray, 167; *Gordon v. Commonwealth*, 92 Pa. St. 216; *State v. Broughton*, 7 Ire. 96; *Burdick v. Hunt*, 43 Ind. 381; *Bressler v. People*, 117 Ill. 422, to which many others might be added.

In this state, the matter is regulated by statute. Section 1774, Revised Statutes, 1879, prescribes the oath which a grand juror is required to take, which is in the usual and ancient form.

Section 1793 provides that: "No grand juror shall disclose any evidence given before the grand jury, nor the name of any witness who appeared before them, except when lawfully required to testify as a witness in relation thereto." Section 1791 provides that: "Members of the grand jury may be required by any court to testify whether the testimony of a witness examined before such jury is consistent with, or different from, the evidence given by such witness before such court, and they may also be required to disclose the testimony given before them by any person upon a complaint against such person for perjury, upon his trial for such offense."

The evil sought to be remedied, by this legislation, was the immunity, which witnesses might enjoy under the old rule, from prosecution for perjury for swearing falsely before the grand jury, and from the discredit which would follow upon the deliverance, on trial, in open court, of evidence different from that delivered under oath before the grand jury. In other words, to remove, as far as was consistent with public policy, the temptation to false swearing before the grand jury. Under this statute, it was held in *Tindle v. Nichols*, 20 Mo. 326, in an action for slander for a charge of false swearing by plaintiff's wife before the grand jury, that a grand juror could not be permitted to testify what the wife testified to before the grand jury. And in *Bean v. Link*, 27 Mo. 261, which was an action for malicious prosecution, it was held that a grand juror could not be permitted to testify that defendants went before the grand jury, and testified as witnesses. In that case, Judge Scott, citing the former case, says: "This opinion is founded on the statute, and the statute itself

has its origin in principles of the common law. Grand juries are now, and have always been, sworn to secrecy. This oath restrained them from disclosing the evidence given before them. The clerk of the grand jury inquest could not be sworn as to matters that transpired before it. These considerations show that there is no reason in law for relaxing the force of the statute in relation to this subject." And in the former case, it was said: "These provisions of our statute concerning secrecy of grand jurors have their origin in the common law. Any person who may be present on the occasion is bound not to disclose what may transpire, and the jurors, themselves, are, by the terms of their oath, laid under the same obligations."

The extent, to which these common-law rules of exclusion has been relaxed, is to be measured by the terms of the statute, and extends only so far as, first, to permit a grand juror, who has heard a witness testify before the grand jury, to give evidence of what that witness testified to, upon a complaint against such witness for having committed perjury in such testimony, or upon his trial for such perjury, and, second, when a witness, who has testified before the grand jury, is being examined in the trial court, in regard to the same matter, and has testified thereto, and it is sought to impeach his evidence (after laying a proper foundation therefor) by showing that he testified differently before the grand jury. In order that it may be determined whether the evidence given before such jury is consistent with, or different from, that given by such witness before such court, a grand juror may be required, as a witness on oath, to disclose the testimony given by such witness before the grand jury. The grand juror cannot be made the judge as to whether the testimony of such witness is consistent or inconsistent. He can only testify as to what the evidence of the witness was before the grand jury. It is for the traverse jury to determine the question of consistency

or inconsistency, and give credit accordingly. And, when the testimony is thus disclosed under the solemn sanction of the juror's oath, according to the best of his recollection, that recollection may be tested by cross-examination. The minutes of the evidence kept by one of their number, unsanctioned by the oath of anybody, cannot be made a substitute for this fair, just and orderly way of getting at the evidence that was actually given before the grand jury.

While the statute permits "every grand jury to appoint one of their number to be clerk thereof, to preserve minutes of their proceedings and of the evidence given before them, which minutes shall be given to the prosecuting attorney" [sec. 1780, *supra*], it has nowhere authorized the admission of these minutes as evidence, anywhere, or for any purpose. They are not required to be signed, and are not sworn to by anybody. They are not the statement, deposition or affidavit of the witness, but simply a memorandum, by which, perhaps, a grand juror's memory might be refreshed, but upon which could not be shifted the responsibility of the juror's oath as to what the witness did actually testify. The juror, who wrote the minutes in this case, could not swear to what the witness testified to before the grand jury, and does not know whether she was ever asked whether it was her statement, when it was read to her. She signed it because the foreman told her to. He had no authority to require her signature. It was simply the *ex parte*, unsworn minute of the juror, who wrote it, of what he thought at the time was the substance of her testimony, but which he could not verify by his oath when called upon to testify.

In Iowa, where, under the statute, a grand juror may be permitted to disclose the evidence of a witness before the grand jury under the same circumstances as with us, it was ruled that the "minutes" of such witness' testimony are inadmissible. *State v. Hayden*, 45

Iowa, 11. The learned judge, delivering the opinion, remarked: "It is the duty of the clerk of the grand jury to take and preserve these minutes of the proceedings and of the evidence given before it. The witness is in no way connected with the act of taking these minutes of his testimony, they are not required to be read over to him, nor to be signed by him. Unlike a deposition or affidavit, they do not purport to give statements of facts, in full, but what the law requires, *mere 'minutes.'* They are often taken down by persons wholly inexperienced in reducing the language of others to writing. A long experience upon the district bench has enabled the writer hereof to observe, that the evidence taken before grand juries is often of the most indefinite and uncertain character, and, if used as the means of impeaching witnesses, would lead to the grossest injustice to witnesses, and tend to defeat a proper administration of justice."

The question of the admissibility of such minutes as evidence has never been passed upon by this court, for the reason perhaps that, until recently, the idea of the competency of such evidence, under the statutes of this state, never suggested itself to the mind of the profession. In *State v. Matthews*, 88 Mo. 121, in which the question was suggested, the minutes were not read, and the court held that the defendant was not injured by the use made of them by the prosecuting attorney, for the purpose of cross-examination. In *State v. West*, 95 Mo. 139, the incompetency of such evidence was urged in the brief of counsel, but the question, not having been properly saved for review, was not considered on appeal by this court.

The error of the court, in admitting the improper testimony, mentioned, particularly the last, must have tended to prejudice the defendant's case. The strength of the state's case rested almost wholly upon the extrajudicial confessions and admission of defendant, as

testified to by two witnesses. Under our practice, the court can instruct the jury only upon questions of law arising in the case. The jury are the exclusive judges of the weight of the evidence, and the credibility of the witnesses. It would be error for the court to comment on the evidence, and a cautionary instruction warning the jury of the intrinsic infirmities of this class of evidence would have been beyond its province. It was, therefore, of the last importance that, against such evidence, the defendant should have the full benefit of all the protection the law throws around him, and the witnesses in his behalf. To meet it in this case, he undertook to establish an *alibi*. His salvation, in a measure, depended upon the success of this defense. By the introduction of these minutes, the state sought to break down the evidence of one of the most important witnesses by whom it was proven. The defense was broken down, and who can say that it was not by the force of this illegal evidence?

For such prejudicial error, the judgment ought and must be reversed, and the cause remanded for new trial, it is accordingly so ordered. All concur; BARCLAY, J., in the result.